PRESENT: All the Justices

COMMONWEALTH OF VIRGINIA

v. Record No. 170995

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
August 9, 2018

COMMONWEALTH OF VIRGINIA, *EX REL.*,
HUNTER LABORATORIES, LLC, ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Thomas P. Mann, Judge


The relators in this *qui tam* case filed this action alleging that several laboratories

illegally inflated the bills they submitted to Virginia's Medicaid program. The case ultimately

settled and the Commonwealth approved the settlement. The relators and the Commonwealth

agree that the relators are entitled to 28% of the proceeds of the settlement. They disagree,

however, with respect to whether that 28% share should come out of the total, or gross, proceeds

of the settlement, or whether the 28% share should come out of the Commonwealth's *net* share

of the proceeds, specifically, what remains after the Commonwealth has refunded a portion of

the proceeds to the United States. The trial court found in favor of the relators, concluding that

they were entitled to receive 28% of the gross proceeds of the settlement. For the reasons noted

below, we agree with the relators, and accordingly we affirm the judgment below.

BACKGROUND

I.      FCA, VFATA AND MEDICAID PROGRAMS.

A suit brought by a private party on behalf of the state is known as a *qui tam* suit. These

lawsuits are sometimes referred to colloquially as "whistleblower" suits. *Qui tam* is an

abbreviation for the Latin phrase "*qui tam pro domino rege quam pro se ipso in hac parte*

*sequitur*," which means "who pursues this action on our Lord the King's behalf as well as his

own." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000). *Qui tam* plaintiffs are referred to as "relators." Although the concept originated in medieval England, it became part of the law of the United States in 1863 when President Lincoln persuaded Congress to enact the False Claims Act ("FCA"), ch. 67, §§ 1-9, 12 Stat. 696 (codified as amended at 31 U.S.C. §§ 3729 through 3733). The original impetus for the FCA was to harness the private sector to hold accountable those who were selling defective supplies to the Union. MONICA P. NAVARRO & J. MARC VEZINA, WHAT IS . . . QUI TAM? (2015).

The Virginia Fraud Against Taxpayers Act ("VFATA"), Code §§ 8.01-216.1 through -216.19, which is modeled after the FCA, seeks to encourage whistleblowers to identify fraud against the government and permits the whistleblower to retain a portion of any recovery. *See* Peter M. Mellette, Emily W.G. Towey & J. Vaden Hunt, *Health Care Law*, 37 U. RICH. L. REV. 199, 212 n.86 (2002). As the United States Court of Appeals for the Ninth Circuit explained with respect to the similar federal statute,

> the purpose of the statutory scheme is clear. The FCA is designed to help fight fraud against the government by encouraging private individuals to come forward with information about fraud that might otherwise remain hidden. The encouragement is provided by giving these individuals a relator's share of any recovery obtained using the relator's information in an FCA action, or an equivalent share of a recovery obtained using that same information to procure an "alternative remedy."

*United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1012 (9th Cir. 2001).

VFATA allows a private party to file a complaint on behalf of the Commonwealth alleging fraud against the Commonwealth. Code § 8.01-216.5(A). Relators must file their complaint in camera and it remains under seal for 120 days, or longer if the Commonwealth requests an extension. Code § 8.01-216.5(B) and (C). The relator must serve the Commonwealth with a copy of the complaint, along with "disclosure of substantially all material

evidence and information the person possesses." Code § 8.01-216.5(B). The Commonwealth can, upon review, elect to intervene and proceed with the action, or it can elect not to proceed with the action, in which case "the person who initiated the action shall have the right to conduct the action." Code §§ 8.01-216.5(B), 8.01-216.6(F).

If there is a recovery, the law entitles the relator to a portion of the recovery. The relator's share is smaller if the Commonwealth elects to proceed with the action, Code § 8.01-216.7(A), and larger if the Commonwealth elects not to participate in the action that the relator brought on behalf of the Commonwealth. Code § 8.01-216.7(B). If the Commonwealth elects to intervene and proceed with the action, the relator's share can be as little as 15% of the recovery or as high as 25% of the "proceeds of the action or settlement of the claim." Code § 8.01-216.7(A). If the Commonwealth does not proceed as a party to the action, the relator who brought the action can receive between 25% and 30% "of the proceeds of the award or settlement." Code § 8.01-216.7(B).[1]

Medicaid is a joint federal and state program. As a general proposition, the federal government contributes approximately 50% of the funding of Virginia's Medicaid program. *See* 42 U.S.C. § 1396b. As a result, 50% of a Medicaid fraud recovery is the property of the federal government. 42 U.S.C. § 1396b(d)(3). *See also West Virginia Dep't of Health & Human Res. v. Sebelius*, 649 F.3d 217, 219, 224 (4th Cir. 2011). In addition, because Virginia has enacted a state version of the FCA, the VFATA, the Commonwealth can retain 10% of the federal Medicaid funds from Virginia Medicaid fraud recoveries. 42 U.S.C. § 1396h.

---

[1] In either situation, the relator is also entitled to recovery of reasonable expenses necessarily incurred, as well as reasonable attorneys' fees and costs. Code § 8.01-216.7(A) and (B).

II.     THE *QUI TAM* CASE AND ITS SETTLEMENT.

The relators in this case filed a complaint alleging that, starting November 1, 1997, the defendant laboratories defrauded the Commonwealth's Medicaid program by overcharging for certain lab tests.  The Commonwealth declined to intervene and the case was unsealed. Ultimately, the relators settled with the defendants in the amount of $1,250,000.  The defendants did not admit liability.  The Commonwealth approved the settlement.

Following this settlement, the Commonwealth and the relators agreed that the relator's share was 28% of the proceeds.  However, the relators and the Commonwealth could not agree on how to calculate the proceeds of the settlement.  The relators argue that the "proceeds of the settlement" means 28% of the gross proceeds of $1,250,000.  The Commonwealth maintains that because Medicaid is a jointly funded state and federal program, the relator's 28% must come from the Commonwealth's share after deducting the portion of the settlement that it must return to the United States government as an "overpayment."  Twenty-eight percent of the gross proceeds of the settlement is $350,000, whereas 28% of the proceeds that remain after deducting the United States' share is $138,925.  The trial court agreed with the relators, and this appeal followed.

ANALYSIS

I.     THE TERM PROCEEDS IN CODE § 8.01-216.7(B) MEANS GROSS PROCEEDS RATHER
       THAN NET PROCEEDS.

We review questions of statutory construction *de novo*.  *Perreault v. Free Lance-Star*, 276 Va. 375, 384, 666 S.E.2d 352, 357 (2008).  "In construing [a statute], we must apply its plain meaning, and we are not free to add [to] language, nor to ignore language, contained in [it].  That is to say, [w]hen the legislature has used words of a plain and definite import the courts cannot put upon them a construction which amounts to holding the legislature did not mean what it has

4

actually expressed." *Andrews v. Richmond Redevelopment & Hous. Auth.*, 292 Va. 79, 86-87, 787 S.E.2d 96, 100 (2016) (citations and internal quotation marks omitted).

Code § 8.01-216.7(B) provides that the relator is entitled to a share "of the proceeds of the award or settlement." We acknowledge that the meaning of the term "proceeds" may depend upon its context. In this context, the phrase "proceeds of the award or settlement" is most naturally read as encompassing the gross proceeds of the award or settlement. Code § 8.01-216.7(B) does not qualify or limit the term "proceeds." The Commonwealth's argument is that "proceeds of the award or settlement" should be interpreted as "proceeds of the award or settlement *after deduction of the United States' share of the settlement.*" The statute, however, contains no such language.

This conclusion, that the proceeds of settlement means the gross proceeds, is fortified by the fact that, on fifty-four occasions, the General Assembly has employed the limiting word "net" in conjunction with the term "proceeds." *See, e.g.*, Code §§ 3.2-3118, 8.01-499, 64.2-535. In this instance, the General Assembly did not specify in Code § 8.01-216.7(B) that the "proceeds" of the award or settlement are the "net proceeds" that remain after deducting certain expenses or costs. The fact that the General Assembly knows how to specify a limitation on the intended measure of proceeds in a statute by employing the phrase "net proceeds," but did not employ that phrase in Code § 8.01-216.7(B), is "an unambiguous manifestation of a contrary intention," indicating that the term "proceeds" was not intended to be limited in any way, *i.e.*, that gross proceeds is the intended meaning. *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 654, 604 S.E.2d 403, 408 (2004); *see also Couplin v. Payne*, 270 Va. 129, 135-36, 613 S.E.2d 592, 594-95 (2005).

5

The Commonwealth argues that "Medicaid fraud recoveries obtained under the VFATA are inherently different from other types of fraud recoveries" because Medicaid is a jointly funded state and federal program. Appellant's Opening Br. at 12; *see* 42 U.S.C. § 1396 *et seq*. The General Assembly was surely aware that the VFATA would be used to recover fraudulent Medicaid expenditures because, long before Virginia's enactment of the VFATA, the federal statute on which VFATA is based had been employed for that purpose. *See, e.g.*, *United States ex rel. Aranda v. Community Psychiatric Ctrs. of Okla., Inc.*, 945 F. Supp. 1485, 1487 (W.D. Okla. 1996); *United States ex rel. Fahner v. Alaska*, 591 F. Supp. 794, 795 (N.D. Ill. 1984); *United States ex rel. Davis v. Long's Drugs, Inc.*, 411 F. Supp. 1144, 1144 (S.D. Cal. 1976). Yet the General Assembly did not treat Medicaid recoveries differently from any other recovery.

The Commonwealth does not make any arguments based on the statute's plain language. Instead, it asserts that the VFATA was enacted with the chief purpose of returning misappropriated public funds to the treasury. Extrapolating from this intent, the Commonwealth posits that the share of a *qui tam* recovery to which the United States government is entitled must be deducted from the overall proceeds. Once this deduction is made, the relator's share can be taken out of what remains. This procedure, it argues, will maximize the funds recovered by Virginia.

The first difficulty with this argument is that, as noted above, it finds no support in the plain language of the statute. The second difficulty is that the Commonwealth's argument is premised on a legal conclusion that draws no support from federal law.[2] Finally, the

_____

[2] The Commonwealth takes the view that the United States has no responsibility to pay a portion of the relator's share and, therefore, the Commonwealth alone must bear the cost of the relator's share. It is clear that under federal law, a recovery by a *qui tam* plaintiff constitutes an "overpayment." *See* 42 U.S.C. § 1396b(d)(3)(A); *West Virginia Dep't of Health & Human Resources*, 649 F.3d at 219, 224 (Money owed to the United States pursuant to a Medicaid fraud

Commonwealth's argument is not especially compelling on its own terms. The Commonwealth maintains that we should construe the VFATA in a way that maximizes the recovery of funds and, to accomplish this objective, we should interpret Code § 8.01-216.7(B) to reduce the relator's share. But it is not obvious that, in the aggregate, the Commonwealth's proposed

---

action are "overpayments" and constitute "[t]he pro rata share to which the United States is equitably entitled."). Consequently, there is no dispute that the United States is entitled to a portion of the *qui tam* recovery. However, the overpayment statute, 42 U.S.C. § 1396b(d)(3), provides that

> The pro rata share to which the United States is *equitably entitled*, as determined by the Secretary, of the *net amount* recovered during any quarter by the State . . . with respect to medical assistance furnished under the State plan shall be considered an overpayment to be adjusted under this subsection.

(emphases added). This statute employs the term "net amount recovered" and speaks of a share to which the United States is "equitably entitled."

In 2008, the United States Department of Health and Human Services ("HHS") sent a letter to state officials which stated that

> For State [False Claims Act] legal actions neither the relator's share, nor legal expenses (whether borne by the State or the relator) or other administrative costs arising from such litigation, may be deducted from the Federal portion of the entire proceeds of the litigation.

Following a lawsuit brought by the State of Alabama, however, a United States District Court vacated this letter and entered an order of remand to afford the Centers for Medicare & Medicaid Services the opportunity to promulgate a new rule that complies with the notice and comment requirements of the Administrative Procedure Act. *See Alabama v. Centers for Medicare & Medicaid Services*, 780 F. Supp. 2d 1219, 1232 (M.D. Ala. 2011). No regulations or guidance have since been issued.

The United States points out in its amicus brief that "HHS has not yet made an adjustment to Virginia's federal Medicaid funding in light of the settlement in this case." United States Amicus Br. at 6. Furthermore, once HHS has determined the federal share of this settlement, Virginia has the option of contesting HHS's determination concerning the amount of the "overpayment." *Id.* at 7. The argument the Commonwealth advances, that the United States is entitled to a full repayment undiluted by the cost of the relator's share, does not find any support in the text of federal statutes, case law, or United States regulations or guidance.

7

reduction in the relator's share will produce more revenue from *qui tam* actions than construing "proceeds" to mean gross proceeds. A significant reduction in the relator's share will discourage relators from bringing these lawsuits. The Commonwealth receives nothing when a relator decides to stay home and foregoes the risk and expense associated with a *qui tam* suit. Speculation about the potential for the Commonwealth to recover less from *qui tam* actions constitutes an insufficient basis upon which to depart from what constitutes the most natural, plain language reading of Code § 8.01-216.7(B).[3]

II.    THE RECORD IS INSUFFICIENT FOR US TO DETERMINE WHAT CLAIMS MIGHT PREDATE THE ENACTMENT OF THE VFATA.

The relators alleged that the excessive billing took place from November 1, 1997 to September 25, 2014. VFATA's effective date was January 1, 2003. Noting that the retroactive application of statutes is disfavored, *see*, *e.g.*, *Bailey v. Spangler*, 289 Va. 353, 358-59, 771 S.E.2d 684, 686 (2015), the Commonwealth argues that there is no indication that the General Assembly intended for the VFATA to have retroactive effect and, consequently, the relators are not entitled to a share of the settlement proceeds from any false or fraudulent billings that were made prior to the VFATA's effective date of January 1, 2003. The parties, however, settled for an undifferentiated amount of $1,250,000. The Commonwealth approved this settlement. Aside from blind guesswork, we have no basis in the record from which we could determine, on a year-to-year basis, how to apportion the relators' share. Without a basis in the record upon which to grant the proposed relief, we must affirm the trial court's judgment on this question. *LeMond v. McElroy*, 239 Va. 515, 520-21, 391 S.E.2d 309, 312 (1990).

---

[3] We recognize that the parties to a qui tam action remain free to reach a settlement concerning a precise figure for the relator's share.

## CONCLUSION

We will affirm the judgment of the trial court.

*Affirmed.*